952 A.2d 304

Calvin J. JACKSON, Personal Representative of
the Estate of Edward H. Saunders, et. al.

v.

2109 BRANDYWINE, LLC, et. al.

No. 317, Sept. Term, 2007.

Court of Special Appeals of Maryland.

July 2, 2008.

**540**

Jonathan M. Wall (Christine E. Burke, Hyatt & Weber, PA, on the brief), Annapolis, for appellant.

Andrew J. Kline (Scott H. Rome, on the brief), Washington, DC, for appellee.

Panel: KRAUSER, C.J., HOLLANDER and WOODWARD, JJ.

HOLLANDER, J.

This appeal is rooted in a transaction that occurred on September 11, 1998, when Edward Saunders, M.D. (the "Decedent"), sold property located in Washington, D.C. to 2107 Brandywine, LLC and 2109 Brandywine, LLC (collectively, "Brandywine" or "Obligors"), appellees. In connection with the transaction, the Obligors executed a "Deferred Purchase Money Promissory Note" (the "Note"), secured by a Deed of Trust. After Dr. Saunders died on November 6, 2002, his girlfriend, Francina Mitchell, allegedly told Brandywine's principal, Frederic Harwood, that she was the personal representative of his Estate, and that the remaining payments due under the Note were to be delivered to her. Thereafter, Brandywine tendered twenty monthly payments on the Note to Mitchell, by checks payable to Saunders. Mitchell deposited them into an account at Provident Bank (the "Account" or "Provident Account"), which had been jointly held by Dr. Saunders and Mitchell.

Calvin Jackson was appointed personal representative of Dr. Saunders's Estate (the "Estate"), and is the appellant here. The Estate claimed it never received payments due under the Note. Eventually, in September 2004, the Estate entered into an Escrow Agreement with Brandywine by which it released the Deed of Trust in return for Brandywine's deposit of $135,000 in escrow—the total of all payments it

claimed to have made to Mitchell, plus interest and late fees (the "Escrow Money").

On December 9, 2005, Brandywine filed a declaratory action against the Estate of Edward H. Saunders, Mitchell, and Provident Bank ("Provident").[1] It sought, *inter alia,* a declaration that it was entitled to the Escrow Money. It also pled an unjust enrichment count against the Estate, and various claims against Mitchell and Provident. The court dismissed all claims against Provident, and entered a default judgment against Mitchell. Following a trial on April 4, 2007, it ruled in favor of Brandywine, by Order entered on April 10, 2007.

Appellant poses three questions, which we quote but have reordered:

1. Did the Circuit Court err in holding that Brandywine's payments to a person posing as a Personal Representative were made in good faith, and that it was equitable therefore to charge the Estate with having received those payments without any evidence that those specific payments benefitted the Estate?

2. Did the Circuit Court err in holding that Mitchell was an agent of the Estate for the purpose of receiving Brandywine ['s] payments, when the Estate never knew that Mitchell was receiving them, and never authorized, approved or permitted Mitchell to receive such payments?

3. Did the Circuit Court err in failing to require that Brandywine trace its funds with certainty through Mitchell's commingled Provident Account to specific items that Brandywine believed benefitted the Estate?

For the reasons set forth below, we shall reverse the judgment of the circuit court and remand for further proceedings.

---

**1.** Brandywine filed a "First Amended Complaint" on February 7,2006. It changed the name of "Provident Bank" to "Provident Bank of Maryland trading as Provident Bank." The Estate filed a "Third–Party and Counter Complaint for Declaratory Relief" on June 16, 2006, adding Walter Childs and Andrew J. Kline, the individuals holding the Escrow Money, as third party defendants.

## FACTUAL AND PROCEDURAL BACKGROUND

Brandywine entered into a contract on March 11, 1998, to purchase from Dr. Saunders certain real property located at 2004, 2006, 2008, and 2014 8th Street NW, Washington, D.C. (collectively, the "Property"). In connection with this purchase, Brandywine signed the Note, dated September 11, 1998, by which it promised to pay $200,000 to Dr. Saunders, secured by a Deed of Trust on the Property. Brandywine timely made monthly payments on the Note. When Dr. Saunders died on November 6, 2002, all of the payments due on the Note had not yet been made.

The parties do not entirely agree on what transpired after Dr. Saunders's death. In the Complaint, Brandywine alleged that it continued to make payments on the Note through its agent, Frederic Harwood, "by and through checks payable to Saunders" (the "Note Checks").[2] Brandywine complained that Provident "permitted Mitchell to negotiate" the Note Checks, even though she was not the payee, and "not the personal representative or any other official representative of the Estate." According to Brandywine, "Mitchell cashed or deposited the checks that she had no authority to negotiate on behalf of the estate. Provident permitted Mitchell to divert the funds from Brandywine . . . ." Further, Brandywine alleged that Mitchell "either deposited or cashed the Note Checks herself, and eventually used these funds for the benefit of the Estate."

The Estate had no appointed or designated representative for more than a year after Saunders's death. Walter S.B. Childs was appointed Special Administrator of the Estate on December 18, 2003. After learning of the Note, he asserted that the Estate had not received the payments due under the Note. By that point, the sum of $34,446.09 remained due, which Brandywine paid directly to the Estate. However,

---

**2.** One of the checks was payable to "Estate of Edward Saunders," but the remaining nineteen were payable to Edward Saunders.

Childs also demanded from Brandywine the amount that it previously paid by way of the Note Checks.

In the meantime, Brandywine decided to sell the Property and, in connection with the sale, sought a release of the Deed of Trust. The Estate agreed to release the deed as part of an Escrow Agreement reached with Brandywine in September of 2004, by which Brandywine placed the amount allegedly due on the Note into an escrow account, until the rights of the parties could be determined.

As noted, Brandywine filed a declaratory action in December 2005. Brandywine also included claims for Conversion (against Mitchell and Provident); Unjust Enrichment (against Mitchell and the Estate); and Negligence (against Provident). It alleged that even though Mitchell diverted the funds paid by Brandywine, she used the money to pay debts of the Estate, and therefore the Estate received the benefit of the payments. The Complaint averred, in part:

23. On December 9, 2004, the Orphan's Court for Anne Arundel County entered a Decision holding that Mitchell is entitled to a reimbursement of $38,076.37 from the Estate, and that this amount will be offset by debts owed by Mitchell to the Estate.

* * *

25. The Court has specifically ruled that the amount reimbursable to Mitchell "will be offset by any debts owed by Francina Mitchell to the Estate," therefore the monies at issue in this action (those that Mitchell attempted to convert from the Estate) may simply be retained by the Estate and withheld from Mitchell.

26. The Estate has received the benefit of the Note Checks paid by Brandywine, and pursuant to the December 9th Order, the amounts that the Estate now claims as due from Brandywine may be offset against the monies that the Estate has been ordered to reimburse Mitchell.

27. Either the Estate is owed the money converted by Mitchell and can simply withhold such money from the

amount that it is ordered to pay Mitchell, or even if the Estate is not entitled to withhold the money, the Estate has received the benefit of the Note Checks in the form of payments made by Mitchell that benefitted the Estate.

\* \* \*

39. As demonstrated by the December 9th Order stating that Estate must reimburse Mitchell for the amounts that Mitchell has expended on behalf of the Estate, the Estate has received the benefit of the monies diverted by Mitchell from the Note Checks. If the Estate is entitled to retain the money paid by Mitchell, retain the benefit of the Note Checks, and the money held in Escrow is released to the Estate, then the Estate in unjustly enriched.

40. If the Estate is entitled to retain the money paid by Mitchell, retain the benefit of the Note Checks, and the money held in Escrow is released to the Estate, then the Estate is unjustly enriched.

Accordingly, Brandywine sought a declaratory judgment "that the Estate has received the benefit of monies paid by Brandywine and diverted by Mitchell" and that the Estate "is not entitled to any further money from Brandywine, and . . . may withhold the monies at issue from the reimbursement requested by Mitchell, or the reimbursement ordered in the December 9th Order." [3]

On April 4, 2007, the circuit court conducted a bench trial as to Brandywine's remaining claims against the Estate. Mr. Childs testified that in December 2003, the clerk of the Orphan's Court advised him that the Orphan's Court judges had an estate for which they wanted him to serve as special administrator. Childs was told there was a danger the Estate

---

3. Brandywine filed a "Motion for Judgment by Default" against Mitchell on May 26, 2006, seeking a judgment of $135,000. Following a hearing on August 9, 2006, the court entered a default judgment in favor of Brandywine and against Mitchell in the amount of $125,854.17. Provident filed a motion for summary judgment on September 11, 2006, which the court granted on October 26, 2006.

would lose certain properties in foreclosure, as it had no funds available to pay the liens. Childs also learned of litigation between Mitchell and Dr. Marilyn Black–Jackson, a former girlfriend of the Decedent, each claiming to be the sole heir to the Estate. Childs accepted the appointment, and immediately sought to ascertain the Estate's assets.

Childs testified that he learned that payments on the Note were due to the Estate, and that the Estate had not received previous payments made by the Obligors. After informing Brandywine of the situation, he began receiving payments on the Note. Childs obtained checks written by Mitchell on the Provident Account, which had been a joint account of Ms. Mitchell and Dr. Saunders. Some of the checks had been paid to a funeral home, presumably for Dr. Saunders's funeral expenses. Childs also learned that the Estate owned properties subject to a mortgage held by Bank of America. Childs made payments on this mortgage on the Estate's behalf.

Brandywine's counsel referred to some of the checks Mitchell drew on the Provident Account. Childs stated that he "found one check to Bank of America," dated December 10, 2002. Childs also identified a check signed by Mitchell, dated February 12, 2003, payable "to ABN AMRO Mortgage Group," another company that held a mortgage on Estate property. He testified that a tenant who was occupying certain Estate property was making rent payments to Mitchell and would not tender any rent to him. Further, he stated that Mitchell deposited U.S. treasury checks payable to her into the Provident Account. Thus, Mitchell's monies were commingled with the proceeds of the Note Checks.

On cross-examination, Childs testified that he secured loans on the Estate's behalf from Dr. Black–Jackson, totaling $91,279.22, in order to pay Estate obligations. He also tried, without success, to obtain funding from Mitchell. He wrote letters to Brandywine's counsel in May 2004, identifying himself as the Estate's Special Administrator, and asking for confirmation that payments remained on the Note. However, Childs did not receive a payment from Brandywine for June

2004. His review of the Provident Account statements showed that Brandywine continued to make payments to Mitchell until September 2004, when he received a check from Brandywine.

Childs's review of the Provident Account also showed that Ms. Mitchell deposited $100,000 in checks from Brandywine, along with checks from insurance companies in payment for Dr. Saunders's services. Appellant's counsel asked Childs: "Are you able to tell from the Provident bank account whose money, that is, whether it's Brandywine's money, or whether it's Francina Mitchell's money, was used to pay any particular expense?" He replied:

> Well, [once] the funds are co-mingled [sic], they become a common pot, and you would have to go through some mathematical calculations to see what percentage of the whole is made up from one source, and what percentage of the whole was made up from other sources, and then when you issue a check from that pot, there is a way you can logically determine how much of the current check going out for an estate expense, comes from what sources. But it's a mathematical calculation.

Childs listed other checks drawn by Mitchell on the Provident Account that did not appear to him to be Estate expenses. These included checks to a cable television company, a high school that Ms. Mitchell's daughter attended, and retailers.

On re-direct examination, Childs identified an accounting he made of the monies taken by Ms. Mitchell from the Provident Account, totaling $145,565.17. On re-cross, he explained that Ms. Mitchell had filed two claims for reimbursement against the Estate: one was for $45,555.38, and the other was for $42,152.26. Attached to these petitions were checks signed by Mitchell, drawn on the Provident Account, and payable to mortgage companies. According to Childs, the Orphan's Court had ruled that the money claimed by Mitchell would be offset against money she owed to the Estate; he could not recall if there was a final resolution of this dispute.

Brandywine's managing member, Frederic Harwood, described the purchase of the Property from his friend, Dr. Saunders. He also testified that Saunders and Mitchell had lived together before Saunders's death, and Mitchell asked him to deliver a eulogy at Saunders's funeral. The following ensued:

[BRANDYWINE'S COUNSEL]: Now, upon Dr. Saunders' death, did you make any inquiry as to what was to happen with respect to the payments that you were to make under the $200,000?

[MR. HARWOOD]: I talked to [Mitchell] at the viewing, and I also talked with her briefly at the church, the morning of the funeral. . . . And I asked her about the executor and whether she was the executor. She assured me that she was. I asked her where the payments should be sent, and she indicated it should be to her home on Six Points Court, *which was the address Dr. Saunders had also directed me to send the payments to,* although most of the payments, while he was alive, I hand-delivered to his office. (Emphasis added).

After Saunders's death, Harwood continued to make payments on the Note, delivering twenty checks, $5,000 each, to Mitchell. Nineteen of the checks were payable to "Edward Saunders" and one was payable to "Edward Saunders estate." Harwood claimed that, during the twenty months he sent the checks to Mitchell, he never had any reason to believe she was not the personal representative of the Estate. Harwood admitted, however, that he never attempted to verify that Mitchell was actually the personal representative. At some point Harwood learned that Mitchell was not the Estate's personal representative, and he immediately sent a $15,000 check to Childs to cover Brandywine's payments on the Note for the months of July, August, and September 2004.

Harwood explained a spreadsheet prepared from statements of the Provident Account, showing deposits of the Note Checks he had tendered to Mitchell. The spreadsheet also listed all the checks Mitchell drew on the account, along with

Harwood's view of whether the check was for payment of an Estate obligation. According to the spreadsheet, Mitchell paid approximately $80,600 of Estate obligations using checks drawn on the Provident Account, into which Brandywine's payments had been deposited.

On cross-examination, Harwood admitted that, in compiling his spreadsheet categorizing the checks Mitchell drew on the Provident Account, he never contacted any of the payees listed on the checks. Instead, he relied on the annotations written on the checks.

After Brandywine rested, appellant moved to dismiss, claiming that Brandywine failed to demonstrate how much of the commingled funds in the Provident Account were used to pay Estate obligations. In denying the motion, the court stated:

My understanding is that Brandywine made payments that totaled $100,000. They paid it to Dr. Saunders, despite the fact that Dr. Saunders had died, in the belief, and certainly at this point, in the light most favorable to [Brandywine], I would have to conclude that, in the good faith belief that Ms. Mitchell was authorized to receive those payments on behalf of the estate, whether she was an executor, whether she was an agent, whether she was the one and only love of his life, I don't have any information on that.

She, in turn, took the money, deposited it into an account, that was, by all information I have so far, Dr. Saunders' account, that was a preexisting account that Dr. Saunders had with her, as a joint tenant in some fashion.

At that moment in time, she's put the money into his pocket, so-to-speak. Now, to that extent, she has done so far, so good [sic].

Now, at that point, she takes some of the money, and she pays some of the bills that belong to the decedent, and she pays apparently some monies for some other things that may be subject to challenge. . . .

But to the extent that she misappropriated any money, at least, at this point, in the light most favorable to [Brandy-

wine], the misappropriation happened from the Estate. The misappropriation happened by taking money that belonged to the decedent and presumably to its heirs of law, after she put them [sic] into an account, and it was the decedent's. It was not [sic] different than putting it into his pocket, and then taking it out the next day.

So this case comes down to, it seems to me, a very straightforward proposition. The facts might be complicated, but the proposition [is], who bears the risk of that loss?

The person who made a death payment, in good faith, for reasons that were logical to that person at that time, without any apparent negligence, or the estate which failed to enter into the proper procedures to open the estate until Mr. Childs was appointed almost a year later, so are the heirs to bear the expense of the loss or is Brandywine? That, to me, is the question.

\* \* \*

I may be completely wrong and, if I am, I apologize, but I don't see the case anywhere near coming down to whether we have to trace every nickel that went in versus what went out.

All I need to conclude is that they made a payment, they weren't negligent, they didn't breach a fiduciary duty, and ultimately comes down to a declaration of who is wrongfully enriched or who is wrongfully deprived, and by whose act?

Richard Chisholm, a lawyer and accountant hired by the Estate to calculate the amount due on the Note, was called by appellant. After adding principal, interest, and late fees, he calculated a balance due on the Note of $153,611.27 as of the hearing. Chisholm was asked whether there was any generally accepted accounting principle that would allow him to trace a payment from the Provident Account to a specific deposit; he answered "no." According to Chisholm, the checks tendered to Mitchell were not proper payments on the Note.

The Estate re-called Childs. He clarified that, prior to Saunders's death, the Provident Account was a joint account

of Mitchell and Saunders with a right of survivorship. Therefore, the funds became the property of Mitchell upon Saunders's death. Childs never had access to the account, nor did Mitchell ever tell him about its existence during his term as special administrator. According to Childs, Mitchell deposited funds to the account that rightfully belonged solely to the Estate.

Appellant's counsel sought to elicit testimony from Childs with regard to the amount of each check issued from the Provident Account traceable to the proceeds of the Note Checks, and the amount traceable to other Estate assets deposited to the account by Mitchell. The court did not permit such testimony, however, because Childs was not qualified as an expert.

Calvin J. Jackson, the Estate's personal representative, testified that he had incurred almost $20,000 in attorney's fees on the Estate's behalf in connection with the underlying litigation. Richard Duden, III, Esq. testified that he had reviewed the records of the Estate's attorney's fees and concluded that they were fair and reasonable.

After hearing arguments from counsel, the court stated:

[I]t is my role, it seems to me, to make a decision as to whether somebody in equity ought to bear the loss, if you will, of any monies that Ms. Mitchell may have misappropriated.

And the question really comes down, in my mind, to one party bears the loss in this case. It's either Brandywine, who is the debtor under the note, or it's the Estate, who is the party entitled to receipt.

I don't view this case—and perhaps that's one of the reasons I didn't have much interest in hearing about it in [sic] earlier, in terms of apportioning this in some fashion, to split the baby in some fashion. I don't see that as my position in this case.

The circuit court continued:

[American Jurisprudence] was cited by [appellant's counsel], but I also would refer to ... the Article on Trusts, Section 402, which talks about the responsibility of the trust, or, in this case, the Estate, to marshal its assets, as [Brandywine's counsel] mentioned.

It says:

"To this end, the Trustee must act as a reasonably prudent person would act to protect his or her own property. The Trustee is expected to use reasonable diligence to discover the location of the Trust property, to take control of it without unnecessary delay, and is chargeable with the value of the assets, lost through a failure in his or her duty to get them into his or her possession."

Now, I recognize that's a proposition of law that perhaps is not focused exactly on the situation here, but it tells us something important, which is that diligence has to be on both sides. Diligence is not simply on the part of the person making the note, that he or she should somehow define whether or not this lady [Mitchell] is a personal representative or not. And, clearly, it could be done.

One could say, let me see the Letters of Administration, I could check with the Court, I could perhaps find out in some other way. It's do-able. I don't mean to suggest that it's not do-able.

But it is also incumbent upon the Estate, and that means the people who ultimately come to Court and claim onto [sic] the Estate to do something.

What happened here, factually, is that Dr. Saunders died in November of '02; Mr. Childs was appointed December of '03, so that's slightly over a year after that.

And then the first letter that I was directed to that put Brandywine on notice that there was an issue, was dated sometime May of '04. And I will concede, for the sake of this discussion, that Mr. Childs was acting diligently, and he did everything that he was supposed to do.

But the point of the matter is that a period of 20–some months expired between the time that the decedent passed away and the time that Brandywine was put on notice that there was a probably [sic] sending these checks.

I find that [Brandywine] acted reasonably in making the payments, in care of Ms. Mitchell. And I'm using that expression on purpose.

The court added:

Ms. Mitchell represented herself to Brandywine as being the person chargeable with collecting this money.

That representation made sense to them because Mr. Harwood knew Dr. Saunders and knew Ms. Mitchell, and knew that they co-habitated together.

\* \* \*

There seems to be plenty of evidence that she was, indeed, handling his affairs. Not perhaps 100 percent but, to some significant extent, that monies that were deposited into this joint account, even though the account ultimately, under Mr. Childs['] testimony, became her sole account, that, nevertheless, she deposited money in there, and paid out of that account a fair amount, a fair number of items that were attributable to him.

The court rejected the Estate's argument that Brandywine failed to trace its funds to payments that were of benefit to the Estate. In its view, "tracing" was unnecessary:

Now, we can certainly ... argue about whether a dollar that came in from Brandywine was used to pay a particular debt of the estate versus money that came in through that account from other sources. There was evidence that there were other sources of income, some rent monies, and some other sources for taxes, and patient funds, and so forth.

But I don't think it's incumbent upon me or necessary that I make a mathematical computation of how much is attributable to his income from other sources versus income from Brandywine.

The court also rejected the Estate's contention that Brandywine had to demonstrate the benefit to the Estate:

Now, there were [sic] $80,600 that came out of that account, according to the tabulation that Mr. Harwood went through. I looked at those.

With the exception of one item here or one item there . . . it seems pretty clear that approximately $80,000 out of that account was used on behalf of Dr. Saunders, on behalf of his properties, on behalf of his assets, and whether some portion might have been attributable to other income, whether she, Ms. Mitchell, that is, should have paid for some of the household expenses that she paid herself, I think it was $5,000 in one place, she drove the Corvette, and she paid for the insurance, that would be clearly within the Estate's rights to go to her and say, you have dissipated estate assets, or, you have used money that you shouldn't have. And I do not question for a minute that she might have misappropriated some funds, but I do not get the impression that she took all of this $100,000 and put it in her pocket, and went off with it.

So [Mitchell], it seems to me, acts as an agent. She goes to Mr. Harwood and his company. She receives a check, and this is very critical, in my opinion—is paid to Dr. Saunders.

This is not a situation where she goes and says, "Look, Dr. Saunders wanted me to have the money, so send me the money."

If they had done that, this case would have been over in a heartbeat, and I would found [sic] the Estate.

They paid the money to Dr. Saunders. That means it belongs to the Estate.

The circuit court concluded:

I believe that the equities dictate that the person who has made this payment in good faith does not bear the responsibility of making the payment yet again, and that the loss in this case falls on the side of the Estate.

The Estate, once it got opened and once the folks at Brandywine got notice of it, the payments were forthcoming.

There was never a problem, there was never a dispute, there was never an issue in their mind that they should pay it anywhere else, and there is no reason to think that had the personal representative or administrator been appointed a year-and-a-half earlier, they wouldn't have done the same.

So my job is very much a matter of balancing the equities and saying, which is more equitable? Is it more equitable under these circumstances to say to Brandywine, you paid this mortgage, the money got stolen, so you've got to pay it again.

Or do I say to the Estate, the mortgage was paid, Ms. Mitchell stole the money from the Estate, and, unfortunately you get stuck with it.

Unfortunately, for the Estate, I find that's the more equitable way to look at this case.

On April 10, 2007, the circuit court issued its "Order—Declaratory Judgment," in favor of Brandywine.

## DISCUSSION.

### I.

In sum, the litigation concerns a claim by the Estate of non-payment by Brandywine, and claim by Brandywine that it fulfilled its obligation under the Note by tendering payment to Ms. Mitchell. Alternatively, Brandywine contends that, even if the Note Checks paid to Ms. Mitchell did not constitute payment under the Note, its obligations under the Note were satisfied because the proceeds from the Note Checks were used for the benefit of the Estate.

Appellant argues that the court erred in awarding the Escrow Money to Brandywine. It disputes the circuit court's finding that, for the purpose of receiving Brandywine's payments, Mitchell was an agent of the Estate. Appellant maintains that the court should have considered the following

language cited by its counsel at trial, from 55 Am.Jur.2d Mortgages § 349: "A mortgagor making payment on a mortgage to one other than the mortgagee does so at his or her peril, and must assume the burden of proving that it was made to one clothed with authority to receive it.[ ]"

In appellant's view, Ms. Mitchell lacked the requisite authority; apparent authority "cannot be founded on statements or conduct by the agent alone." (citing *Taylor v. Equitable Trust Co.*, 269 Md. 149, 161–62, 304 A.2d 838 (1973)). Instead, insists appellant, apparent authority exists only where a principal makes manifestations to a third party "that would indicate [the agent] had any authority" to take the relevant actions. Appellant posits that Brandywine never introduced evidence of such manifestations by the Estate, and adds that Ms. Mitchell's claim to Mr. Harwood that she was the personal representative was "insufficient, in and of itself, to establish apparent authority." Indeed, appellant notes that, at the time of Mitchell's representation to Harwood, the Estate had no personal representative, and therefore no one to confer authority on Mitchell. Further, appellant contends that, when the Estate acquired a Special Administrator (Childs), he "had no knowledge of Mitchell's acceptance or depositing of the Brandywine payments."

Moreover, appellant argues:

[T]he authority of a Personal Representative is not even a creature of consent between principal and agent, but an authority that is granted by the Orphans' Court pursuant to statute. That authority arises from letters of appointment, and, in order for letters of appointment to issue, a putative personal representative must satisfy the conditions of the Orphans' Court, one of which includes the posting of a bond.

Because Brandywine failed to show that Mitchell satisfied these statutory requisites, appellant avers that the court could not "infer that [she] was a Personal Representative."

Brandywine counters that the circuit court's decision "was not based upon agency," and any claim that the court erred in holding that Mitchell was an Agent "is a misinterpretation of

the Court[']s decision, and not grounds for any reversal." It maintains that the court "never held that Mitchell was an 'agent of the Estate,' only that Mitchell acted as an agent in receiving the payments and using those payments for the benefit of the Estate." Brandywine points to the court's conclusion that "approximately $80,000 out of the account was used on behalf of Dr. Saunders, on behalf of his properties, on behalf of his assets . . . ." According to Brandywine, the finding was supported by Childs's testimony, and the copies of cleared checks entered into evidence, "which in most cases contained written notarizations indicating the purpose of each check from the account, which allowed the Court to determine what the checks were used to pay."

In Brandywine's view, appellant's brief "confuses" the finding as to agency. Brandywine asserts:

[W]hether or not Mitchell was an agent, a question that is not relevant to this Court's consideration, the Estate's Brief ignored the facts and the Circuit Court's factual finding that Mitchell was clothed with the authority of the Estate, received the funds for the Estate, and then only later may have converted some of these funds. Also, the Estate fails to acknowledge that because there was no Personal Representative or Special Administrator for the first year of the Estate, Mitchell was the only person clothed with this authority. The Court had significant evidence, as demonstrated above in finding that "the mortgage was paid, Ms. Mitchell stole the money from the Estate, and, unfortunately you get stuck with it."

In his reply brief, appellant repeats the argument that Mitchell could not be an agent of the Estate, "or an 'agent in receiving payments.'" Further, appellant insists that, upon Saunders's death, "his contractual right to payment from Brandywine under the Note passed directly to the Personal Representative of Saunders' Estate." Appellant continues:

Thus, the proper payee for any check payable to the Estate was a payee by the name of "The Estate of Edward Howard Saunders" or "The Personal Representative For The Estate

Of Edward Howard Saunders". However, not a single one of Brandywine's checks was made payable to the Estate or to the Personal Representative. Nor, it is worth mentioning, was a single check made payable to the Estate "in care of Mitchell". Indeed, each of the checks was made payable to Howard [sic] Saunders, a person whom Brandywine knew was deceased, but nonetheless his signature appeared on the back of the checks. Brandywine knew, or should have known, that that signature was forged. Moreover, even if Brandywine had made a payment to the Estate "in care of Mitchell", that payment would not have been proper because the correct payee was the Personal Representative of the Estate of Edward Howard Saunders.

## II.

In our view, the circuit court erroneously determined "that the equities dictate that the person who has made this payment in good faith does not bear the responsibility of making the payment yet again, and that the loss in this case falls on the side of the Estate." The circuit court did not employ the proper legal standard in assessing whether the Note Checks tendered to Ms. Mitchell constituted proper payments on the Note. The court also erred by rejecting appellant's argument that Brandywine had the burden of establishing that it made payments to the proper party, or a party with apparent authority.

 Generally, once the existence of a payment obligation is established, the party asserting that payment has been made has the burden of proving that fact by a preponderance of the evidence. *Kruvant v. Dickerman,* 18 Md.App. 1, 3, 305 A.2d 227 (1973); *see Lynch v. Rogers,* 177 Md. 478, 484, 10 A.2d 619 (1940). Therefore, a "mortgagor making payment on a mortgage to one other than the mortgagee does so at his or her peril," and assumes the burden of proving the payments were made to one clothed with authority to receive them. 55 Am.Jur.2d Mortgages § 349.

■ Brandywine, the plaintiff below, claimed that it had made the payments in issue. "Payment" is an affirmative defense under the Maryland Rules. *See* Md. Rule 2–323(g)(11). Obviously, in the context of a declaratory action brought by Brandywine, it could not raise payment as an affirmative defense. After placing the contested sum in an escrow account, Brandywine initiated the declaratory action to determine whether it had the right to the money in escrow. The procedural posture of the case does not alter the fact that the burden of establishing payment remained with the debtor, Brandywine, as surely as if this case were a suit by the Estate against Brandywine to recover the debt.

■ With respect to the merits, *Doeller v. Mortgage Guarantee Co.*, 166 Md. 500, 171 A. 856 (1934), is instructive. On May 9, 1930, Ms. Doeller purchased a fractional share of a mortgage, and named the Mortgage Guarantee Company (the "guarantee company") her exclusive agent for collecting interest due under the mortgage. Three years later, on August 22, 1933, Doeller's attorney, Charles Byrne, purported to terminate the guarantee company's agency, by sending a letter to it on Doeller's behalf. On the same date, Byrne sent the mortgagor a letter directing it to make all future payments to him. Doeller brought suit against the mortgagor, alleging that it had failed to make an interest payment to her or Byrne by the payment's due date. She conceded, however, that the payment had been timely made to the guarantee company. In examining whether the mortgagor's payment to the guarantee company was effective, the Court stated, *id.* at 508, 171 A. 856:

Under the terms of the mortgage, the interest was payable to Doeller on September 16th, and the fact that the mortgagor paid it to some other person for Doeller on that day in the belief that such payment was authorized by Doeller would not excuse its failure to pay it to Doeller on that day, if in fact such payment was not authorized by her, or unless Doeller by her conduct had led the mortgagor as a reasonably prudent and careful person to believe that it was so authorized.

Applying this standard to the facts of the case, the Court observed that the mortgagor had no evidence, aside from Byrne's own letter, that he was actually Doeller's lawyer, authorized to revoke the guarantee company's agency and direct payment of interest to him. Nor had Doeller personally given such directions to the mortgagor. The Court reasoned:

[I]f the mortgagor had paid the interest to [Byrne], as he directed, and it subsequently appeared that she had not authorized such payment, *it would not only have been in default, but would have been compelled to pay the money to her personally, notwithstanding the payment to Byrne.*

\* \* \*

If [Doeller] desired the interest paid directly to her or to some person designated by her other than the guarantee company, she should have personally so notified the mortgagor or have furnished some evidence of Byrne's authority to act for her. She did neither, nor did she furnish it with her address nor designate any place at which the payment might be made[.]

\* \* \*

Under the circumstances, in view of the facts (1) that the mortgagor actually paid the money due Doeller on the day it became due to the guarantee company which had theretofore acted as her agent, (2) that she failed (a) either in person or in writing to notify the mortgagor that the agency had been revoked, or (b) *to furnish it with any evidence of Byrne's agency which would have protected it in paying the interest to Byrne,* as was done in *Johnson v. Young[s],* 82 Wis. 107, 51 N.W. 1095, (3) that Byrne's letter neither informed the mortgagor of Doeller's address, nor supplied any evidence of his authority to receive the interest due Doeller, (4) that the money due Doeller was promptly paid to Byrne, whose agency she subsequently recognized in her petition filed in this proceeding, it would seem that the delay in paying the interest to her was as much her fault as that of the mortgagor, and that she is estopped from

insisting that the mortgage was in default because the payment was made on the day on which the interest was due to her former agent instead of to Byrne.

*Id.* at 508–10, 171 A. 856 (emphasis added).

In this case, Brandywine did exactly what the *Doeller* Court warned would result in a default: it paid Mitchell based solely on her representations of agency.

*Silver Spring Title Company, Inc. v. Chadwick,* 213 Md. 178, 131 A.2d 489 (1957), is also pertinent. There, Silver Spring Title Company, Inc. ("Silver Spring") prepared two identical deed of trust notes to procure two separate construction loans, secured by two separate properties. *Id.* at 179, 131 A.2d 489. Each note "was made payable to the order of Moore & Hill Company and each stated that the trustees were William A. Hill ('Hill') and George A. Chadwick, Jr." *Id.* The notes and deeds of trust were duly signed and executed, and the deeds of trust were recorded in October 1949. *Id.* The notes "were assigned to Chadwick and sent to him." *Id.*

Silver Spring sought release of one of the deeds of trust in March 1950, drawing its check in the required amount, payable to Moore & Hill Company. This payment was passed on to Chadwick, who had possession of the note, and sent the cancelled note and duly executed deed of release to Silver Spring. In December 1950, Silver Spring sought to cancel the outstanding note and obtain a release of the remaining deed of trust. Substantially the same procedure was followed by Silver Spring, except that two checks instead of one were sent to Moore & Hill Company. These checks were deposited to the account of Moore & Hill Company, but the proceeds were never paid to Chadwick, the holder of the note. Thereafter, Silver Spring learned that Hill had died and that Chadwick refused to execute a release of the deed of trust. Moore & Hill Company was a sole proprietorship of William A. Hill and did not have sufficient assets to refund Silver Spring's payments.

The Court stated, *id.* at 180–81, 131 A.2d 489:

The question is, who should bear the loss when the agent of the borrower ... pays the debt to someone other than the holder of the note? [Silver Spring] claims that Moore & Hill Company was acting as agent for Chadwick in receiving the money on these loans. This claim of agency is based upon the fact that the previous note had been paid off in an identical manner and Chadwick had executed the necessary deed of release.

The notes used in these transactions were negotiable, *Le Brun v. Prosise,* 197 Md. 466, 79 A.2d 543, and of such a character that they could and quite possibly would be negotiated and passed on into the hands of a third party. *No effort was made by the appellant to discover the actual holder thereof and payment was made to Moore & Hill Company in spite of appellant's knowledge that the previous note had been negotiated to a third party.* This previous note was clearly endorsed to show crediting of the proceeds to Chadwick as Attorney for the holder of the note. While it is true that Chadwick did not object to the payment of the previous note to Moore & Hill Company, *there is no evidence that he ever authorized Moore & Hill Company to accept payment for the same. Chadwick's conduct in this one instance would not be sufficient to lead a reasonably prudent and careful person to believe that Moore & Hill Company were authorized to receive payments on the notes.* (Emphasis added).

The Court concluded that the agent of the borrower should bear the loss, and affirmed the trial court's dismissal of the appellant's complaint. *Id.* at 182, 131 A.2d 489. It reasoned, *id.* at 181–82, 131 A.2d 489:

It has long been recognized in this State that when a maker of a note pays the debt to someone who does not have possession of the note, such payment is no defense to an action by the holder of the note. *Dunham v. Clogg,* 30 Md. 284.

The case of *Hoffacker v. Manufacturers['] Nat'l Bank of Baltimore* (not reported in the State Reports), 23 A. 579, involved a foreclosure of a mortgage when the two notes

there given were paid to someone other than the holder. This Court said: "It was Hoffacker's own negligence that he paid the notes to Crowl without requiring them to be surrendered to him. He placed his confidence in his own attorney, and he ought not to hold the bank responsible for the consequences of his misplaced confidence. * * * It is the business of the debtor to seek the creditor and pay his debts when they are due. * * * These notes were negotiable in form, being payable to the order of Crowl. Hoffacker knew that Crowl had it in his power to convey a perfect title to them by negotiating them before maturity, and the most ordinary prudence would have suggested that he should not have paid them to Crowl without obtaining possession of them." (Emphasis added.)

Although *Doeller* and *Silver Spring* are several decades old, the rule for which they stand has been applied more recently in other jurisdictions. *See, e.g., Equity Bank v. Gonsalves,* 44 Conn.Supp. 464, 691 A.2d 1143, 1145–46 (1996) ("The rule as to the payment and discharge of negotiable instruments is that the payment of the bill or note must be made to the rightful holder or his authorized agent.... Paying the wrong party does not discharge a negotiable note") (citations omitted); *Madison–Hunnewell Bank v. Hurt,* 903 S.W.2d 175, 179 (Mo. App.1995) ("The rule is that the payor of a note exposes himself to double liability if he delivers his payment to someone other than the holder. However, there is one exception to the rule: if the payor can show that the one to whom he paid the money stood in the position of agent to the owner of the note, he is entitled to the benefit of payment."); *Manufacturers & Traders Trust Co. v. Korngold,* 162 Misc.2d 669, 618 N.Y.S.2d 744 (Sup.1994) ("Inasmuch as payment to an agent who has neither possession of the note and mortgage nor express authority to receive payment does not relieve the mortgagor of the obligation to make payment to the mortgagee, a mortgagor making payment to an agent who fails to provide any evidence of its authority does so at his peril.") (citation omitted); *Lambert v. Barker,* 232 Va. 21, 348 S.E.2d 214, 216 (1986) ("[T]he burden of proving an agency relation-

ship rests on the party claiming payment as a defense. One making payment to an agent has the burden of showing that the agent has either express or apparent authority to receive such payment upon behalf of his principal, and the evidence to that effect must be clear and convincing. If payment is made to a party who does not have in hand the obligation, the debtor takes the risk of such party having the authority to make collection."); *see also* 59 C.J.S. Mortgages § 453 (2007).

We are also guided by *Ward v. Federal Kemper Insurance Co.,* 62 Md.App. 351, 358, 489 A.2d 91 (1985), in which the Court recited the following principle: "When the drawer draws a check on the drawee *and delivers the check to the payee,* the check ordinarily is regarded as only a conditional payment of the underlying obligation." (Emphasis added). In other words, writing a check to a payee has no effect on the underlying obligation until the check is delivered to the payee. This principle is embodied in Md. Code (1975, 2002 Repl. Vol.), § 3–420 of the Commercial Law Article ("C.L."), which provides: "An action for conversion of an instrument may not be brought by ... a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee." The U.C.C. Comment to this section states:

> In revised Article 3, under the last sentence of Section 3–420(a), the payee has no conversion action because the check was never delivered to the payee. Until delivery, the payee does not have any interest in the check. The payee never became the holder of the check nor a person entitled to enforce the check. Section 3–301. Nor is the payee injured by the fraud. Normally the drawer of a check intends to pay an obligation owed to the payee. *But if the check is never delivered to the payee, the obligation owed to the payee is not affected.* If the check falls into the hands of a thief who obtains payment after forging the signature of the payee as an indorsement, the obligation owed to the payee continues to exist after the thief receives payment. Since the payee's right to enforce the underlying obligation is

unaffected by the fraud of the thief, there is no reason to give any additional remedy to the payee. (Emphasis added).

Brandywine tendered payments to Dr. Saunders while he was alive. When Dr. Saunders died, an event of which Brandywine had actual knowledge, it was obvious that Brandywine could no longer tender payments directly to him. Therefore, Brandywine should have endeavored to ascertain the proper payee before paying Mitchell; it had the right to request that Mitchell establish herself as the proper payee. Although nobody was named to the position of personal representative for some time after Dr. Saunders's death, Brandywine could have deposited payments into an escrow account, pending the opening of the Estate and appointment of a personal representative. Instead, Brandywine tendered checks to Ms. Mitchell, based solely on her claim that she represented the Estate, and Brandywine's assumption that she was authorized to receive the funds.

Even if the trial court erred in failing to assign to Brandywine the burden of establishing that it made payments on the Note, we would uphold its verdict if the court had properly found that Ms. Mitchell acted as an agent of the Estate. The Estate insists that it never authorized Mitchell to act as its agent. Brandywine contends that the court's ruling did not rest on a finding that Mitchell *was* the Estate's agent, but rather that she "acted as an agent" of the Estate. Brandywine cites no authority for its position that Mitchell could "act" as an agent without *being* an agent.

In assessing whether Mitchell was an agent of the Estate, we begin with a review of the principles of agency law. An agency relationship "arises from the manifestation of the principal to the agent that the agent will act on the principal's behalf." *Anderson v. General Cas. Ins. Co.*, 402 Md. 236, 247, 935 A.2d 746 (2007); *see In. Co. of N. Am. v. Miller*, 362 Md. 361, 373, 765 A.2d 587 (2001). Put another way, "The authority of an agent must come from the principal." *Homa v. Friendly Mobile Manor*, 93 Md.App. 337, 359, 612 A.2d 322 (1992). The Restatement defines "agency" as "the fiduciary

relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1 (1958). This definition has been cited favorably by several Maryland appellate decisions. *See, e.g., Beyond Systems, Inc. v. Realtime Gaming Holding Co., LLC,* 388 Md. 1, 26–27, 878 A.2d 567 (2005); *Green v. H & R Block, Inc.,* 355 Md. 488, 503, 735 A.2d 1039 (1999); *Bowser v. Resh,* 170 Md.App. 614, 632–33, 907 A.2d 910 (2006).

■■■■ A person may be deemed an agent based on actual authority or apparent authority. Actual authority exists only when "the principal knowingly permits the agent to exercise the authority or holds out the agent as possessing it." *Homa,* 93 Md.App. at 360, 612 A.2d 322. Actual authority may be express or implied. *See Medical Mut. Liab. v. Mutual Fire,* 37 Md.App. 706, 712, 379 A.2d 739 (1977) ("The relation of principal and agent does not necessarily depend upon an express appointment and acceptance thereof, but it may be implied from the words and conduct of the parties and the circumstances.") *See also Heslop v. Dieudonne,* 209 Md. 201, 206, 120 A.2d 669 (1956). Moreover, an actual agency relationship may be established by written agreement or inference. *Patten v. Board of Liquor,* 107 Md.App. 224, 238, 667 A.2d 940 (1995); *see Citizens Bank of Maryland v. Maryland Indus. Finishing Co. Inc.,* 338 Md. 448, 459, 659 A.2d 313 (1995) ("Actual 'authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.'") (quoting Restatement (Second) of Agency § 26). When a party asserts a claim that is dependent upon an agency relationship created by inference, that party has the burden of proving the existence of the principal-agent relationship, including its nature and its extent. *Hofherr v. Dart Industries, Inc.,* 853 F.2d 259, 262 (4th Cir.1988); *Schear v. Motel Management Corp. of America,* 61 Md.App. 670, 687, 487 A.2d 1240 (1985).

■■■■ Under the equitable doctrine of apparent authority, a principal will be bound by the acts of a person purporting to act for him when "the words or conduct of the principal cause the third party to believe that the principal consents to or has authorized the conduct of the agent." *Johns Hopkins University v. Ritter*, 114 Md.App. 77, 96, 689 A.2d 91 (1996); *see Klein v. Weiss*, 284 Md. 36, 61, 395 A.2d 126 (1978); *Parker v. Junior Press Printing Service*, 266 Md. 721, 727–28, 296 A.2d 377 (1972); *B.P. Oil Corp. v. Mabe*, 279 Md. 632, 370 A.2d 554 (1977); *Reserve Ins. Co. v. Duckett*, 240 Md. 591, 214 A.2d 754 (1965); *see also Integrated Consulting Services, Inc. v. LDDS Communications, Inc.*, 996 F.Supp. 470, 475 (D.Md. 1998), *aff'd*, 176 F.3d 475 (4th Cir.1999) (applying Maryland law). A similar showing is required to establish agency by estoppel, a situation in which a party "who receives money, or anything of value in the assumed exercise of authority as agent for another, is estopped to deny such authority in criminal prosecutions, as well as in civil actions." 2A C.J.S. Agency § 48. Like apparent authority, "an agency by estoppel can arise only where the principal, through words or conduct, represents that the agent has authority to act and the third party reasonably relies on those representations." *Johns Hopkins*, 114 Md.App. at 96, 689 A.2d 91.

■■■■ The existence of an agency relationship is a factual matter. *Faya v. Almaraz*, 329 Md. 435, 460, 620 A.2d 327 (1993); *see P. Flanigan & Sons v. Childs*, 251 Md. 646, 653, 248 A.2d 473 (1968) (recognizing that the existence of an agency relationship is ordinarily a question of fact); *Levine v. Chambers*, 141 Md. 336, 343, 118 A. 798 (1922) ("[I]t is not for the court to determine the question of agency *vel non*, but if the testimony as to the fact of the agency tends to prove the existence of that relation, it should be submitted to the jury, who are the exclusive judges of its weight."); *see Green*, 355 Md. at 505, 735 A.2d 1039. Ultimately, a reviewing court must determine that there was an intent to enter into an agency relationship. *Homa*, 93 Md.App. at 359, 612 A.2d 322. Intent may be inferred from conduct, including acquiescence. *Green*, 355 Md. at 506, 735 A.2d 1039.

.

Because the trial here was non-jury, our review of factual determinations is governed by Maryland Rule 8–131(c). *L.W. Wolfe Enterprises, Inc. v. Maryland National Golf, L.P.*, 165 Md.App. 339, 343, 885 A.2d 826 (2005), *cert. denied*, 391 Md. 579, 894 A.2d 546 (2006). It provides that we "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8–131(c). "If there is any competent and material evidence to support the factual findings of the trial court, those findings cannot be held to be clearly erroneous." *YIVO Institute For Jewish Research v. Zaleski*, 386 Md. 654, 663, 874 A.2d 411 (2005). As the Court said in *GMC v. Schmitz*, 362 Md. 229, 764 A.2d 838 (2001), " 'The appellate court must consider evidence produced at the trial in a light most favorable to the prevailing party and if substantial evidence was presented to support the trial court's determination, it is not clearly erroneous and cannot be disturbed.' " *Id.* at 234, 764 A.2d 838 (citation omitted).

Although the factual determinations of the circuit court are afforded significant deference on review, " 'the clearly erroneous standard for appellate review . . . does not apply to a trial court's determinations of legal questions or conclusions of law based on findings of fact.' " *Ins. Co. of N. Am. v. Miller*, 362 Md. 361, 372, 765 A.2d 587 (2001) (citation omitted). Instead, "where the order involves an interpretation and application of Maryland statutory and case law, we must determine whether the lower court's conclusions are 'legally correct' under a *de novo* standard of review." *Walter v. Gunter*, 367 Md. 386, 392, 788 A.2d 609 (2002).

There was no evidence here of conduct by the Estate or the personal representative authorizing Mitchell to act as the Estate's agent. Indeed, the Estate was incapable of extending such authorization before the appointment of Childs, because until that point the Estate had no one through whom it could act. Although the court could have found that Saunders, while he was alive, authorized Mitchell to receive

payments on the Note, it did not so conclude, nor was there any such evidence. Recognizing that neither Saunders nor the Estate expressly delegated authority to Mitchell, the court inferred such a relationship solely from the actions of Mitchell. The law is clear, however, that a principal-agent relationship must arise from the conduct of the principal, not the agent. To the extent that the court found that Mitchell was an agent of the Estate, its finding was clearly erroneous.

The circuit court also found that the Estate failed to act with reasonable diligence in connection with the Note Checks. It relied on the following language from 76 Am.Jur.2d Trusts § 402:

[T]he trustee must act as a reasonably prudent person would act to protect his or her own property. Thus, the trustee is expected to use reasonable diligence to discover the location of the trust property and to take control of it without unnecessary delay, and is chargeable with the value of assets lost through a failure in his or her duty to get them into his or her possession.

The court's reliance on this language was misplaced. The statement above sets forth a trustee's duties to a trust. But, the treatise does not suggest that a third party can rely on a trustee's failure to comply with his duties to the trust as a defense for its own failure to properly tender payments to the trust. As discussed above, the obligors had the duty to make payments to the proper person.

In any event, the evidence did not show a lack of diligence by Estate representatives. The court found that Mr. Childs acted diligently. With respect to the period before Childs assumed his duties, Childs testified, "there was no one in charge of the estate" until his appointment, which did not take place until a year after the Estate came into existence. During that year, according to Childs, both Ms. Mitchell and Dr. Black–Jackson were claiming to be the personal representative. Appellant argues that this dispute is what held up the appointment of representation for the Estate; appellant does not, however, provide any support for this assertion.

Whatever the cause of the delay, the salient point is that for a whole year the Estate had no representatives to act on its behalf, either diligently or negligently. Without a representative, the Estate could take no action with respect to the Note Checks. Although Brandywine had the burden of establishing payment, it seems to blame the non-corporeal Estate for a lack of diligence. We conclude that the court erred in finding that Brandywine satisfied its obligations under the Note by tendering payment to Mitchell. The payments were not effective, and therefore Brandywine remained liable to the Estate.

## III.

If Mitchell had merely absconded with the Note Checks, there would be nothing further for us to decide. Under that scenario, the Estate would be entitled to all of the money in the Escrow Account, for the reasons outlined above, and Brandywine would have to pursue a judgment against Mitchell to recover the proceeds of the Note Checks. However, in this case Brandywine insists that because Mitchell used the proceeds from the Note Checks to pay Estate obligations, it is entitled to a credit to the extent of such payments.

Having held that Brandywine satisfied its obligations under the Note by tendering the Note Checks to Ms. Mitchell, the circuit court did not fully examine what Mitchell did with the funds. Nevertheless, it found that Mitchell used "approximately $80,000" of the proceeds of the Note Checks "on behalf of Dr. Saunders, on behalf of his properties, on behalf of his assets[.]"[4] In our view, this was an alternative ground for the court's decision, but it only accounts for part of the court's judgment in favor of Brandywine.

According to appellant, the circuit court "erred in failing to require that Brandywine trace its funds with certainty through Mitchell's commingled Provident Account" to specific expenditures that Brandywine believed were made on behalf of or for the benefit to the Estate. Appellant notes that

---

4. Sometimes the court said $80,000 and sometimes it said $80,600.

Mitchell deposited the Note Checks between November 6, 2002 (the date of Saunders's death) and August 11, 2004 (the date the Provident Account was "effectively closed"). Appellant divides this time frame into two discrete periods. According to appellant, in the period between November 6, 2002, and May 28, 2003, the Provident Account contained $35,000 derived from Brandywine's payments, which was commingled with $114,952.68 from other sources. Appellant claims that this total amount was used to satisfy approximately $67,187.61 in Estate obligations, and Mitchell paid herself $82,707.33. Further, appellant claims that between June 27, 2003, and August 2, 2004, the sum of $65,000 in payments from Brandywine was deposited; only one other deposit was made; and "only one possible Estate Obligation [1] was paid by Mitchell"— a $135.39 BG&E bill. According to appellant, the remaining funds, totaling $64,864.61, "were absolutely and unequivocally taken by Mitchell."

Based on these contentions, appellant disputes the circuit court's conclusion that Mitchell used most of the Brandywine funds to pay Estate obligations. He argues that it was "incumbent upon Brandywine to meet its burden to trace its funds through Mitchell's commingled Provident Account through to an Estate Obligation." In this regard, he asserts:

> In the instant case, the Estate's certified public accountant, Richard Chisholm, when asked whether it was possible to trace Brandywine's funds through Mitchell's commingled Provident Bank account, simply stated: "no." Moreover, Brandywine failed to present any witness to contradict the testimony of Mr. Chisholm, and failed to present any other evidence that might bear on the topic of tracing.

Appellant argues: "Maryland courts have had the opportunity to report cases in which tracing, in other contexts, has been attempted. Those attempts, except where the proof has been unequivocal, have apparently all failed." Relying on these precedents, appellant asserts that " 'tracing' of funds must be established with *certainty*, and that the commingling of funds in complex transactions is a substantial, if not fatal, impediment to 'tracing.' " According to appellant:

Brandywine's funds were inextricably commingled with funds from Mitchell, funds from Dr. Saunders' patients, funds from Dr. Saunders' tenants, and others. Brandywine, however, failed to present any evidence of tracing, or rebut the Estate's accountant's testimony that tracing was impossible, although it was Brandywine's burden, and in Brandywine's best interest, to do so. Because Brandywine failed to meet its burden of "tracing" its funds to specific Estate Obligations, there was no basis for the trial court to conclude or assume that the Estate had received a benefit, and the Circuit Court erred in awarding any portion of the Escrow Account to Brandywine.

Appellant recognizes that Brandywine asserted a claim of unjust enrichment if the Estate were permitted to receive the proceeds of the Escrow Account, which contained an amount equal to the funds that Brandywine previously tendered to Mitchell. But, he disputes that the Estate was unjustly enriched by Brandywine's payments. As to the first element of such a claim, argues appellant, Brandywine failed to show, through tracing, that it conferred a benefit on the Estate through Mitchell's "commingled" Provident Account. With respect to the second element of unjust enrichment—that the Estate knew or appreciated the benefit—he claims that "the Estate does not know of any benefit from Brandywine: indeed, Brandywine has not traced that benefit, and, as Brandywine is well aware, Mitchell has claimed that *she* paid the Estate Obligations." With regard to the third element of unjust enrichment, asserts appellant, "there is nothing inequitable about the Estate retaining the Escrow Account: it did not receive payment, due to Brandywine's negligence, and Brandywine has not proven that [its] payments to Mitchell benefitted the Estate." Appellant continues:

As a result of Brandywine's payments to Mitchell, the Estate was insolvent, forced to borrow $91,279.22 . . .—not coincidentally, close to what Brandywine had paid to Mitchell—and to litigate with Brandywine.

Whatever "benefit" Brandywine might have provided to Mitchell's swelling bank account, Brandywine has simply

not *proven* that any benefit reached the Estate, particularly where most of all the funds in the account—not just Brandywine's—ended up in Mitchell's hands. That failure is fatal to Brandywine's claim of "unjust enrichment." *See, e.g., Crosby v. Crosby,* 769 F.Supp. 197 (1991) (noting that Maryland has never accepted an "indirect" benefit theory). The Circuit Court therefore erred in finding that the "equities" required that Brandywine escape any liability for its payments to Mitchell, and, more particularly, that the Estate received any "enrichment", much less an "unjust" enrichment, at the hands of Brandywine.

Brandywine discerns no error. In its view, the circuit court correctly "held that the payments were made properly, that Brandywine acted reasonably in making payments under the Note, that the Estate received these funds upon payment, and that only after receipt did Mitchell convert some of the funds while using the majority to benefit the estate."

According to Brandywine, appellant's tracing argument "ignores the central holdings of the Circuit Court: that Brandywine acted reasonably in making payments to the Estate care of Mitchell, that Mitchell then used these funds on behalf of the Estate, and that the Estate received the funds by virtue of their payment by Brandywine prior to any misappropriation by Mitchell." Although Brandywine concedes that "each dollar" cannot "be traced in and out of the Estate account," it maintains that appellant has "concocted" a bogus argument regarding failure to trace the funds from the Account. In its view, tracing would be relevant only if it had made payments on the Note "incorrectly or negligently, and if those funds should have been made to another recipient." It adds: "Once the Estate receives the funds, there is no need to trace the funds to determine if the Estate later benefitted from the funds it already received."

Moreover, Brandywine contends that appellant "does not advance any case law in support of the proposition" that "payments to a deceased individual must be traced to Estate expenses before they can be considered paid to the Estate."

The evidence was sufficient, asserts Brandywine, to support the court's findings that it "properly paid the Estate," and "Mitchell was using the account as an Estate account, paying obligations of the Estate from that account," with "the Estate receiv[ing] the funds upon payment." The Obligor continues:

> Any argument that commingling of funds makes tracing impossible, ignores the facts and the holding that when the checks were delivered to Mitchell the Estate received the funds. Whether the funds were then used for Estate purposes or stolen is irrelevant in determining that the payments were made by Brandywine and received by the Estate. Therefore, tracing is unnecessary.

To support its claim that the Estate "received the funds," Brandywine points out that the court expressly found that Brandywine "acted reasonably in making the payments, in care of Ms. Mitchell." According to Brandywine, the court recognized that "Ms. Mitchell represented herself to Brandywine as being the person chargeable with collecting this money" and "[t]hat representation made sense to [appellant] because Mr. Harwood knew Dr. Saunders and knew Ms. Mitchell, and knew that they co-habitated together." It adds that there was no other evidence "that Brandywine should have made payments elsewhere . . . and no other evidence as to why Harwood's decision to pay Mitchell was not reasonable . . . ."

Notably, appellee points out that Saunders died in November 2002, yet no one on behalf of the Estate contacted Brandywine regarding alleged non-payment until May of 2004. In its view, "A reasonable person would assume that if payments were not received by the proper party, some notice would be given concerning nonpayment." Appellee posits that "Brandywine could have assumed that if the Estate was not receiving the funds, the Estate would contact Brandywine." Further, Brandywine argues that unjust enrichment "is irrelevant because the Court did not find the Estate liable under a theory of unjust enrichment."

In its reply brief, appellant observes that Brandywine "cites no authority" for its contention that "there is no need to trace the funds to determine if the Estate later benefitted from the funds it already received." Reiterating that Maryland courts require that funds be "traced" through a commingled account, appellant defines tracing as "a concept that simply means the act of demonstrating a direct mathematical relationship between deposits into a commingled account and payments from that commingled account." Urging this Court to reverse, appellant asserts:

> The Circuit Court's refusal to require that Brandywine trace its funds through Mitchell's Provident Account, and to simply speculate that $80,000 of Brandywine's money was used by Mitchell for Estate Obligations, was clearly erroneous. Brandywine's funds were inextricably commingled with funds from Mitchell, funds from Dr. Saunders' patients, funds from Dr. Saunders' tenants, and others, and Brandywine failed to present any evidence why its funds—as opposed to the funds of others deposited into Mitchell's Provident Account—were the source of Mitchell's payments toward Estate Obligations. Even if such speculation by the Circuit Court were credited, the Circuit Court's holding that the entire escrow account—now exceeding $140,000.00—should be awarded to Brandywine could not be sustained.

 Under Maryland law, [a] claim of unjust enrichment is established when: (1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return. *Benson v. State*, 389 Md. 615, 651–52, 887 A.2d 525 (2005). "A person confers a benefit upon another if he gives to the other possession of or some other interest in money[.]" Restatement of Restitution § 1 cmt. a (1937, updated through 2006). " 'In an action for unjust enrichment the burden is on the plaintiff to establish that the defendant holds plaintiff's money and that it would be unconscionable for him to retain it.' " *Bank of America Corp. v.*

*Gibbons,* 173 Md.App. 261, 268, 918 A.2d 565 (2007) (quoting
*Plitt v. Greenberg,* 242 Md. 359, 364, 219 A.2d 237 (1966)).

 "A person who receives a benefit by reason of an
infringement of another person's interest, or of loss suffered
by the other, owes restitution to him in the manner and
amount necessary to prevent unjust enrichment." *Berry &
Gould v. Berry,* 360 Md. 142, 151, 757 A.2d 108 (2000) (quoting
Restatement (Second) of Restitution § 1 (Tentative Draft No.
1, 1983)). *See Gibbons,* 173 Md.App. at 267, 918 A.2d 565.
"The doctrine of unjust enrichment is applicable where 'the
defendant, upon the circumstances of the case, is obliged by
the ties of natural justice and equity to refund the money,' and
gives rise to the policy of restitution as a remedy." *Hill v.
Cross Country Settlements, LLC,* 172 Md.App. 350, 914 A.2d
231 (2007) (citations omitted). "The restitutionary remedies
and unjust enrichment are simply flip sides of the same coin."
*Alternatives Unlimited, Inc. v. New Baltimore City Bd. of
School Comm'rs,* 155 Md.App. 415, 454, 843 A.2d 252 (2004).
Thus, "[r]estitution involves the disgorgement of unjust en-
richment." *Consumer Protection Div. v. Morgan,* 387 Md.
125, 168, 874 A.2d 919 (2005).

 Here, the court found that the Estate received the
benefit of $80,600 in proceeds of the Note Checks, as a result
of Ms. Mitchell's payment of Estate obligations after the Note
Checks were deposited into the Provident Account, and subse-
quently used to settle obligations of the Estate. In our view,
the court was entitled to credit Brandywine with the proceeds
of the Note Checks, to the extent that it was satisfied that a
particular portion of the money was used to pay Estate debts
or obligations. If the Estate were permitted to obtain those
monies from the Escrow Account, it would be unjustly en-
riched because it would, in effect, recover twice.

We reject appellant's argument that the court should have
"traced" these funds with mathematical certainty. We are
unable to find any relevant Maryland cases setting forth the
precise showing Brandywine should have made to establish
that the Estate received the relevant monies. Nevertheless,

the fact that restitution is an equitable remedy affords the trial court considerable discretion in calculating the amount of money that should be returned to the owner. Harwood reviewed the checks Mitchell drew on the Provident Account, and testified as to the use of funds to pay Estate obligations. The court did not err in relying on this testimony, and concluding that the Estate benefitted from $80,600 in proceeds from the Note Checks.

The court awarded Brandywine the full amount of the Escrow Account, rather than just the $80,600 of Note Checks proceeds that the Estate received. Therefore, we shall vacate the judgment of the circuit court, and remand to that court, with instructions to revise its judgment to award Brandywine $80,600 of the Escrow Account, and to award the balance of the Escrow Account to the Estate.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 50% BY APPELLANT AND 50% BY APPELLEES.**